## BROOKS, administrator, *et al.* *v.* MILLER.

1. The letters relied upon in this case to satisfy the statute of frauds were sufficiently definite to constitute a contract.
2. When a contract for the sale of an undivided interest in land is made conditional upon a division between the cotenants, and the subject-matter of the sale is the interest of one of the cotenants after such division, and the purchaser, who is also the agent of the owner, is to see to the division being made, and the division so made is to be by arbitration instead of by the statutory method, and no time is specified in which such division

shall be made, the enforcement of such contract depends upon the ability of the purchaser to bring about the division which is made a condition in the contract. When the owner sells to a third person before such division has taken place, it will be a question for the jury to determine from all the facts of the case whether such a division could have been brought about, and also whether a reasonable time had elapsed, before the sale to the third person, for the person first contracting for the land to have begun proceedings for the division of the property.

3. In such a case, if the division could have been made and the owner sold before a reasonable time for it to have taken place had elapsed, he would be liable for damages to the person who had first contracted for the land, and the measure of damages would be the difference between the contract price and the market value of the land at the time the division could have been completed. If the market value at such time was no greater than the contract price, then nominal damages only could be recovered.

4. The contract in this case was of the character above described; and the questions above referred to should have been submitted to the jury for determination.

Argued January 26, — Decided March 24, 1898.

Complaint for damages. Before Judge Norwood. City court of Savannah. July term, 1897.

Clayton P. Miller sued F. X. Mousseau, Sarah Mousseau, and Benjamin R. Dillon, for $8,700 damages from an alleged breach of contract, alleging, that on March 15, 1888, the defendants agreed in writing with the plaintiff to sell him their undivided four-fifths interest in 84 lots of land, described as a subdivision of garden lots numbers 16 and 17 in Chatham county, at $100 per lot, but that defendants refused to carry out the agreement, and on May 1, 1888, without notice to plaintiff, sold and conveyed the property to D. B. Lester. The defendants pleaded the general issue, and the statute of frauds. F. X. Mousseau died, and Brooks, his administrator, was substituted as a party defendant. It appeared that on May 3, 1887, F. X. Mousseau, for himself and as attorney in fact for his wife and for Benjamin Dillon, signed and delivered to Miller, the plaintiff, an agreement and power of attorney constituting Miller agent "for the management and care of those lots of land consisting of 87 more or less [describing the lots in question], in which lots said F. X. Mousseau has a one-fifth interest, the wife of said F. X. Mousseau has a two-fifths interest; also of that certain five-acre lot of land in said county of Chatham known as the

Desverges tract, held as are the 87 lots just mentioned; also of the 100-acre farm on the Louisville road in the county of Chatham, held as are the two other pieces of property just mentioned; also the piece of property described as belonging to Mrs. F. X. Mousseau." This paper further states, that Miller is authorized to negotiate the sale of the property; that no proposition for its purchase can be made or accepted by him until first made known to and ratified by F. X. Mousseau; that in the event of a sale of the property by Miller, he shall be paid for his services reasonable and just compensation; and that the agreement is to continue for one year from its date. On August 27, 1887, plaintiff wrote to F. X. Mousseau, that Lester (who owned a fifth-interest in the land in question) had expressed a desire that Mousseau should divide the land and let him (Lester) have his share. The letter further stated that inquiries as to the price had been made of him (plaintiff) by several parties, and he believed these approaches were made in the interest of Lester. He told them he was not at liberty to make a price. On December 10, 1887, he wrote to Mousseau that he believed Lester would sell his share, and that the property as a whole could be sold; also, that if Mousseau would state a price for the four-fifths share, he (plaintiff) would endeavor to obtain a purchaser, and would also see "D. B. L." On December 20, 1887, he wrote to Mousseau that he had seen Lester a few days before, and Lester said he had authorized his attorney to apply to the court for a division of the property. The writer added that this appeared to him to be, perhaps, the best; that Mousseau might then readily sell the lots; that he (plaintiff) could obtain, and in fact had been offered, $100 per lot for Mousseau's share, part cash and the balance at seven per cent. interest; and would be willing to give this himself, if Mousseau was disposed to sell.

On March 1, 1888, Mousseau, who was then at Montreal, Canada, wrote to the plaintiff the first of a series of letters which the plaintiff claimed contained the contract in question. This letter said: "You sometime ago offered me $100 for the unsold lots of 4-5. Say you take at par whatever is due upon sold lots in Kline hand and in LaRoche one, all at par 4-5 of

5 acres Desverges tracts and farm 100 acres near Monteith;
the two last are not much. Say Brother Miller you will take
all at whatever you offered. See Mr. Adams. I told Mr.
Adams. I took you for one of the five to divide. Do all you
can in our favor. But, Bro. Miller, you know what I am, I
mean justice and I am sure you do mean justice. Get my 4-5
of all, and I am willing to sell as I told you above. Let me
know at once. If you gave me $100 net for my 4-5 with Les-
ter. Be one of the arbitrators before you mention anything.
Remember, I am willing to sell at $100 a lot net cash for the
whole. Of course I want to sell that farm and 5 acres lot in
Desverges tract. I am sure you understand what I mean, and
give me a reply at once." The plaintiff, in a letter to Mousseau,
dated March 6, 1888, said: "In reply to your favor of March
1st. I note your sentiments in letter of above date, and ap-
preciate them. I accept your offer, and take the remaining
4-5 of lots in Dillon tract, after the division with D. B. L., at
the price named, viz. $100 per lot. As to the lots that are al-
ready sold and the country property, we will say nothing until
after the division; but I shall then take them at a fair valua-
tion, in order to relieve you. I shall endeavor to push up the
division for your sake." In reply to this, Mousseau in a letter
dated March 15, 1888, said: "Last Friday I had your favor
and read contents. If understand you and it is what I meant
also. Each lot that the 4-5 will bring us you will pay me net
$100 for. I must say that to parties interested, and it is what
I wrote to one already. I am glad you are kind enough to
take our interests and save expense. Besides D. B. L. don't
get his own way. Hurry up," etc. It does not appear whether
the power of attorney from Mousseau to plaintiff had been re-
voked or not when these letters were written. The plaintiff
testified that he did not remember when it terminated. Sub-
sequently Mousseau came to Savannah, and after some nego-
tiations between him and Lester for the sale of the property,
defendant, in May, 1888, sold and conveyed to Lester, for
$8,500, the land described in the declaration, together with
other property, the description in the deed being as follows:
"All those tracts of land situate and being in the city of Sa-

vannah, county of Chatham and State of Georgia, portions of tract originally known as the Butcher Pen tract and subdivisions of Garden Lots 16 and 17 in the said county of Chatham, lying east of Burroughs street in said city, the said lots being 84 in number and known by the following numbers on the plan of the subdivision of the said Butcher Pen tract into 109 lots made by David R. Dillon in his lifetime" (here follow the numbers of the 84 lots); "also those other lots of the same subdivision of the Butcher Pen tract which were bargained by the said David R. Dillon, the purchase-money therefor not having been fully paid, and the same not having been conveyed to the purchaser, that is to say" (here follow 10 lots, giving their numbers); "also a tract of land in Chatham county near Montieth station on the Louisville road, containing 100 acres more or less; also another tract of land in the county near the Thunderbolt road, described as the Desverges land purchase by Dillon, 5 acres more or less." Mousseau had a power of attorney from Dillon, executed May 26, 1885, authorizing him to sell any of Dillon's property in Chatham county. Lester's purpose in buying was to sell again, and this was known to Mousseau. On the day on which this purchase was made, Lester sold and conveyed to other parties four-fifths interest in the 68 lots in question, for $10,900. On August 2, 1888, he sold four-fifths interest in 16 of the lots for $3,200. One of the purchasers testified that if their interest had been partitioned they would have received 67 1-5 lots costing them $209.82 per lot, that this was a fair value for the lots at that time, and that they were sold later at a higher price. On May 15, 1888, Mousseau, who had returned to Montreal, wrote a letter to the plaintiff, in which, among other things, he said: "I wished I could have sold you those lots. There was no way first to divide with D. B. L. . . By selling to Lester I avoided long contest about dividing. . . Had I been sure to go so soon I would have told you Saturday, but I could not say even Saturday morning that I was sure of having sold, for nothing was signed nor paid. . . I hope you see in what predicament I was. . . I am sure that within next fall I could not rid myself of D. B. L., without speaking of the rest. I could not stand temperature. I left

quick. I was pleased to meet you on the S. S.," etc. Lester testified that Mousseau offered him the lots at $100 each, and subsequently, to induce him to buy, threw in the other property described in the deed. Lester thought the deed covered everything that Mousseau had. Lester had a fifth-interest in the 84 lots and in the 10 for which Dillon had bargained in his lifetime.

There was a verdict for the plaintiff for $7,379.90, with interest from August 4, 1888. The defendants' motion for a new trial was overruled, and they excepted. The motion was upon the grounds, that the verdict was contrary to law and evidence, and excessive; and that the court erred : In charging the jury, that the evidence introduced by the plaintiff made a complete contract and took the case out of the statute of frauds. In charging, that the three letters put in evidence by the defendants, dated respectively August 27, December 10, and December 20, 1887, did not have any bearing on the case, unless it may be one statement in the last letter, as to the price of $100 for each one of the lots, but that this letter was in harmony with the subsequent correspondence. In charging, touching the measure of damages : " When a man is purchasing real estate, as in this case, for the purpose of selling it again, what might be called speculation, — trading in it, and that fact is known to the party who sells it, he is responsible for whatever loss the purchaser, or would-be purchaser, would sustain by reason of the breach of the contract." And in charging : "In this case the plaintiff brings you a standard by which to judge his loss. He proves to you that, for the breach, the defendant sold the property to another man, and that within a short time, two or three months probably, that purchaser sold the property for a certain amount in advance of what Mr. Miller here was to pay for the property. That is a standard by which you can be guided, and the plaintiff in this case is entitled to what the amount is that he lost by reason of the defendant not keeping his contract. You look to the evidence and see what amount was to be paid, that is not disputed, I mean under my view of the contract; — see what the property sold for ; and then you can ascertain in that way what is the loss that has

been sustained by the plaintiff in this case, and you will be authorized to allow interest on that amount from the time that this breach was committed. You can take the date of the deed, and from that time you will be authorized to allow interest upon the amount."

*Denmark, Adams & Freeman,* for plaintiffs in error.
*Saussy & Saussy,* contra.

SIMMONS, C. J.   1. Dr. Mousseau and certain members of his family owned a four-fifths undivided interest in 84 lots of land in the city of Savannah, Georgia, and a certain amount of country property. D. B. Lester owned the other fifth-interest in the city lots. By virtue of a power of attorney given him by these members of his family, Mousseau had control of this property and authority to dispose of it. He and his family resided in Canada, and he appointed Miller of Savannah, Georgia, as his agent to negotiate a sale of the property. Some correspondence was had between Mousseau and Miller in regard to the sale of the land, and will be found in the official report preceding this opinion. Mousseau was a Frenchman, and from his letters it will be seen that he was not well acquainted with the English language. A close study of the letters of Mousseau and Miller has convinced us that they were sufficiently definite to constitute a contract for the sale of the four-fifths interest in the city lots. The substance of the correspondence is about as follows: Miller, when he was appointed agent, was prohibited from making or accepting any proposition for the purchase of the property without the consent of his principal, Mousseau. There was some inquiry about the lands, but Miller could not, without consulting Mousseau, fix the price of them. He wrote Mousseau that he thought he could get $100 per lot for Mousseau's share of the lots, and that he would himself be willing to take them at that price, after a division of the property had been had with D. B. Lester. Mousseau in reply made a proposition to Miller, offering to sell his four-fifths interest in the lots for "$100 net for my 4/5 with Lester," and also offering to sell him the other property. Miller answered, accepting "the remaining 4/5 of lots in Dillon tract, after the division with D. B.

L., at the price named, viz. $100 per lot," but postponing the consideration of the offer as to the country property until later. Mousseau's next letter, referring expressly to the city lots, accepted Miller's offer as to these lots, and said nothing about the country property.   While Mousseau's offer was not accepted as a whole by Miller (for he declined to take the country property), yet we think that when Mousseau replied to Miller's proposition, making reference to the city lots and saying nothing about the country property and accepting the proposition as to the city lots, this letter, taken with Miller's, made a complete, valid and binding contract between the parties.   It was an offer by Miller to purchase at a fixed price Mousseau's interest in the city lots and declining for the time to enter into any contract in regard to the country property, and an express acceptance by Mousseau of Miller's offer for the city lots.   Until Mousseau's letter of March 15, 1888, there was no binding contract, because Miller did not accept Mousseau's offer in its entirety, and there was no meeting of the minds of the parties; but Mousseau's letter of that date accepted Miller's offer, the minds of the parties met, and the contract was valid and binding.

2.  A careful reading of the whole correspondence referred to above will show that there was, in the minds of both parties, a condition which was to be performed before the contract in regard to the sale of the lots was to be enforceable.   This condition was that the lots in which Mousseau owned a four-fifths interest were to be partitioned or divided between him and Lester who owned the other fifth in them.   The lots had to be divided before Miller could ascertain how much money he would have to pay to Mousseau, and the latter could not take the purchase-money until this division had been made.   It appears that Mousseau had appointed Miller as one of his arbitrators to make the division, and the correspondence seems to indicate that other persons had also been appointed to serve. Mousseau's letter of March 15 urges Miller to hurry up the division so that he could receive the purchase-money, one of his family being "in need of cash."   From Miller's letter of March 6, it appears that he also understood that there was to be a division; for he writes:   "I accept your offer and take the re-

maining 4/5 of lots in Dillon tract, after the division with D. B.
L., at the price named, viz. $100 per lot." Thus both parties
understood that there was to be a division before the contract
was to be executed, but no time was agreed upon for this divi-
sion to be brought about. The correspondence also indicates
that Miller was the person who was to bring about this divi-
sion. The record does not show that Miller took any steps to-
ward having the lots divided. As far as can be determined
from the record, Mousseau waited about fifty days, then ap-
peared in Savannah and sold his four-fifths interest in the lots
to his cotenant, Lester, at the same time selling him the coun-
try property. Miller, learning of this sale, brought an action
against Mousseau for a breach of the contract made with him.
On the trial Miller recovered. Mousseau's administrator (Mous-
seau having died pending the action) made a motion for a new
trial, which was denied, and he brings the case here for review.
We think that, under the facts, before Miller could recover
damages from Mousseau for a breach of contract, it was incum-
bent upon him to show to the satisfaction of the jury what steps
he had taken to bring about the division of the lots. He should
show what, if anything, he did in this regard, or whether the
time between the closing of the contract between him and Mous-
seau and the time of the sale to Lester was sufficient for him
to have brought about the division. Was there any progress
in that direction between March 15 and May 4? Was the time
sufficient to have accomplished a partition? Or did Miller
simply rest upon the contract and do nothing toward bringing
about a division of the land? If it was his duty to have the
division made and he did nothing towards that end, and Mous-
seau waited a reasonable time upon him, we think he ought
not to recover. He knew from the correspondence that Mous-
seau was in a hurry to have the land partitioned, and he prom-
ised in his letter "to push up" the division. The record,
however, does not show that he made any effort in this direc-
tion during the fifty days which elapsed. Under the circum-
stances, he was not at liberty to postpone the division for an
unreasonable time. Upon the other hand, Mousseau should
have waited a reasonable time for Miller to have brought about

the division. If he sold the lots to Lester without giving Miller a reasonable time to make the division, he would be liable to Miller for damages for breach of contract. These are questions entirely for the jury to pass upon under the evidence which may be submitted on the next trial of the case.

3. The general rule of damages for a breach of contract for the sale of land is the difference between the price paid or agreed upon and the market value of the land at the time of the breach. In this case, where the contract was conditioned upon the division of the property, the measure of damages is the difference between the contract price of the land and its market value at the time the division could have been completed. If, for instance, the division could have been completed within fifteen or twenty days after the contract was made, the measure of damages would be the difference between the price Miller agreed to pay and the market value at the end of the fifteen or twenty days. If the market value at such time was no greater than the contract price, then Miller would be entitled to recover nominal damages only. While it would be admissible to show what the land sold for shortly after the breach, this would not fix the amount of damages but would be evidence as to the market value of the land. It might be true that the person who bought these lots from Lester, for some reason, gave more than the market value of the land, or that the land advanced rapidly in value subsequently to the time when the division could and would have been made. If Miller be entitled to recover at all, we think that the measure of damages is as laid down above.

4. The charge of the court as to the measure of damages was incorrect, and the question of reasonable time for the bringing about of the division of the property was not properly presented to the jury. For these reasons, we think the plaintiffs in error are entitled to a new trial. There were other points insisted on by counsel for plaintiff in error, and especially that Miller in his declaration averred his readiness and ability to perform his part of the contract with Mousseau, but failed or omitted to make any proof upon this point. As we grant a new trial upon other grounds, we deem it unnecessary to discuss this

question, as it may not arise upon the next trial. On that trial Miller may, if his counsel think it necessary and he was in fact ready and able to perform, introduce evidence upon this point.

*Judgment reversed. All the Justices concurring.*